## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THARUN EKAMBRAM, derivatively on be-half of RTX CORPORATION f/k/a RAY-THEON TECHNOLOGIES CORPORA-TION, | **Case No.** |
| Plaintiff, | |
| v. | |
| GREGORY J. HAYES, NEIL MITCHILL, ANTHONY F. O' BRIEN, TRACY A. AT-KINSON, BERNARD A. HARRIS, JR., GEORGE R. OLIVER, ROBERT K. ORTBERG, MARGARET L. O' SULLI-VAN, DINESH C. PALIWAL, ELLEN M. PAWLIKOWSKI, DENISE L. RAMOS, FREDERIC G. REYNOLDS, BRIAN C. ROGERS, JAMES A. WINNEFELD, JR., and ROBERT O. WORK, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants, | |
| -and- | |
| RTX CORPORATION f/k/a RAYTHEON TECHNOLOGIES CORPORATION, | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Tharun Ekambram ("Plaintiff"), by and through Plaintiff's undersigned attorneys,

derivatively on behalf of Nominal Defendant RTX Corporation f/k/a Raytheon Technologies Cor-

poration ("RTX" or the "Company"), brings this Verified Shareholder Derivative Complaint

against Gregory J. Hayes ("Hayes"), Neil Mitchill ("Mitchill"), Anthony F. O'Brien ("O'Brien"),

Tracy A. Atkinson ("Atkinson"), Bernard A. Harris, Jr. ("Harris"), George R. Oliver ("Oliver"),

Robert K. Ortberg ("Ortberg"), Margaret L. O'Sullivan ("O'Sullivan"), Dinesh C. Paliwal ("Paliwal"), Ellen M. Pawlikowski ("Pawlikowski"), Denise L. Ramos ("Ramos"), Fredric G. Reynolds ("Reynolds"), Brian C. Rogers ("Rogers"), James A. Winnefeld, Jr. ("Winnefeld"), and Robert O. Work ("Work") (collectively, the "Individual Defendants" and, together with RTX, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by RTX with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought against certain RTX officers and members of RTX's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between February 8, 2021 and September 11, 2023, both dates inclusive (the "Relevant Period").

2.    Based in Arlington, Virginia, RTX[1] is "an aerospace and defense company that provides advanced systems and services for commercial, military and government customers worldwide." RTX's operations are classified into four principal business units: (1) Pratt &

---

[1] RTX is the result of a merger that closed in April 2020 between Raytheon Company and United Technologies Corporation (the "Merger"). In July 2023, the Company changed its name from Raytheon Technologies Corporation to RTX Corporation. The Company prior to the Merger refers to Raytheon Company, and the Company after the Merger refers to RTX.

Whitney; (2) Collins Aerospace Systems; (3) Raytheon Intelligence & Space; and (4) Raytheon Missiles & Defense.

3.    The Pratt & Whitney segment focuses on building and supplying aircraft engines for commercial, business, as well as military jet and general aviation customers. RTX describes Pratt & Whitney as follows:

> Pratt & Whitney is among the world's leading suppliers of aircraft engines for commercial, military, business jet and general aviation customers. Pratt & Whitney's Commercial Engines and Military Engines businesses design, develop, produce and maintain families of large engines for wide- and narrow-body and large regional aircraft for commercial customers and for fighter, bomber, tanker and transport aircraft for military customers. Pratt & Whitney's small engine business, Pratt & Whitney Canada (P&WC) is among the world's leading suppliers of engines powering regional airlines, general and business aviation, as well as helicopters. Pratt & Whitney also produces, sells and services military and commercial auxiliary power units.

4.    One of the products offered by the Company's Pratt & Whitney business unit is the geared turbofan ("GTF") engine. Pratt & Whitney's website describes the GTF engine as "the only geared propulsion system delivering industry-leading fuel efficiency and sustainability benefits." Further, it states that "[o]ur geared fan has fundamentally changed how more sustainable propulsion works. Having quickly become the foundation of our industry's future, our gear system has re-set the bar on the good that all other advanced technologies can deliver – from advanced materials to hybrid-electric systems to sustainable aviation fuels."

5.    Throughout the Relevant Period, the Individual Defendants caused the Company to make materially false and misleading statements regarding the GTF engines, failing to disclose to investors that the GTF engines were plagued by quality control issues that would eventually result in a recall and reinspection of the engines, causing substantial losses for RTX.

6.    The truth began to emerge on July 25, 2023, when RTX announced during an earnings call that it had discovered various issues with Pratt & Whitney's engines, and therefore would

3

be forced to recall over 1,000 of the GTF engines. This recall was the result of a "rare condition" in powered metal which meant "1,200 of more than 3,000 engines" will have to be taken off and inspected for micro cracks and fatigue.

7.    On this news, RTX's stock price fell $6.58 per share, or 7.9%, from a closing price of $83.48 per share on September 8, 2023, to a close at a price of $87.10 per share on July 25, 2023.

8.    The truth fully emerged on September 11, 2023, when RTX announced that the quality control issues impacting the GTF engines was far more serious than Defendants originally represented to investors. That day, RTX revealed that it would be inspecting 3,000 of its GTF engines and further disclosed that RTX would be forced to pay up to $7 billion in costs to repair its engines and properly compensate the airlines harmed by the GTF engine failures.

9.    On this news, RTX's stock price fell $6,58 per share, or 7.9%, from a closing price of $83.48 per share on September 8, 2023, to close at a price of $76.90 per share on September 11, 2023.

10.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and/or omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions that failed to disclose, among other things, that: (1) the GTF engines were impacted by quality control issues from at least 2015 to 2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, impacting its customers and harming its business; and (3) the Company failed to maintain internal controls. As a result, Defendants' statements about the Company's business,

operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties when they willfully and recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

12.     Furthermore, during the Relevant Period, the Individual Defendants caused RTX to repurchase millions of shares of its own stock that were artificially inflated due to the above misrepresentations. Defendants Atkinson and Ortberg engaged in lucrative insider sales during this period of inflated value, and netted combined proceeds of over $5 million. Approximately 64, 747,000, shares of the RTX common stock were repurchased during the Relevant Period for a staggering $5.9 billion. Since the Company's stock's true value was $76.90 per share during that time, the price at closing on September 11, 2023, the Company overpaid nearly $907.2 million in total.

13.     The Individual Defendants' misconduct negatively impacted the value of the Company, caused the Company to pay unjust compensation to Defendants, subjected the Company to costly investigations and settlements, subjected the Company, its Executive Chairman and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to a federal securities fraud action lawsuit pending in U.S. Court of Appeals for the Second Circuit (the "Securities Class Action"). The Individual Defendants' misconduct further created a need for the Company to expend resources by undertaking internal investigations, implementing adequate internal controls. The Company also incurred losses from the waste of corporate assets, including through overpayment for stock through the repurchases referenced herein. In sum, RTX has spent

hundreds of millions of dollars because of the Individual Defendants' misconduct and will continue to expend millions more.

14.     On October 31, 2024, Plaintiff, through Plaintiff's counsel, served a demand on RTX's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing RTX to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A. On January 6, 2025, Plaintiff's counsel received a letter on behalf of the Board (the "Demand Refusal Letter") indicating that the Board had decided to defer consideration of the Demand until the resolution of the motion to dismiss the Securities Class Action. A copy of the Demand Refusal Letter is attached hereto as Exhibit B.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, RTX is incorporated in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

19.     Plaintiff is a current RTX shareholder and has continuously held RTX stock at all relevant times.

**Nominal Defendant RTX**

20.     Nominal Defendant RTX is a Delaware corporation with principal executive offices at 1000 Wilson Boulevard, Arlington, VA 22209. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX."

**Defendant Hayes**

21.     Defendant Hayes has served as the Company's CEO since April 2020 and as the Executive Chairman of the Board since April 2021. As a member of the Board, he serves on the Finance Committee and the Special Activities Committee. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Hayes beneficially owned 1,131,955 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Hayes owned approximately $137.521 million worth of RTX stock.

22.     For the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"), Defendant Hayes received $3.42 million in total compensation from the Company.

**Defendant Mitchill**

23.     Defendant Mitchill has served as the Company's CFO since April 9, 2021. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Mitchill beneficially owned 153,203 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Mitchill owned approximately $18.6 million worth of RTX stock.

24.     For the 2024 Fiscal Year, Defendant Mitchill received $9,050,000 in total compensation from the Company.

**Defendant O'Brien**

25.     Defendant O'Brien served as the Company's CFO from April 2020 until April 2021. Prior to the Merger, he served as the Company's CFO beginning in March 2015. According to the 2022 Proxy Statement, as of February 10, 2022, Defendant O'Brien beneficially owned 14,181 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 10, 2022 was $95.06, Defendant O'Brien owned approximately $1.35 million worth of RTX stock.

26.     For the 2021 Fiscal Year, Defendant O'Brien received $11,018,183 in total compensation from the Company.

**Defendant Atkinson**

27.     Defendant Atkinson has served as a Company director since the Merger in April 2020. She also serves as the Chair of the Human Capital & Compensation Committee and as a member of the Finance Committee. Prior to the Merger, she served as a Company director from 2014 until April 2020. She also served as the Chair of the Audit Committee. According to the 2023 Proxy Statement, as of February 8, 2023, Defendant Atkinson beneficially owned 20,153 shares

of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $97.65, Defendant Atkinson owned over $2.49 million worth of RTX stock.

28.    For the 2024 Fiscal Year, Defendant Atkinson received $386,925 in total compensation from the Company.

### Defendant Harris

29.    Defendant Harris has served as a Company Director since 2021. He also serves as a member of the Audit Committee and as a member of the Special Activities Committee. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Harris beneficially owned 8,950 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Harris owned approximately $1,087,335.5o worth of RTX stock.

30.    For the 2024 Fiscal Year, Defendant Harris received $344,425 in total compensation from the Company.

### Defendant Oliver

31.    Defendant Oliver has served as a Company director since the Merger in April 2020. He also serves as a member of the Human Capital & Compensation Committee and as a member of the Finance Committee. Prior to the Merger, he served as a Company director from 2013 until April 2020. He also served as the Chair of the Management Development and Compensation Committee and as a member of the Governance and Nominating Committee. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Oliver beneficially owned 29,110 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on February 18, 2025 was $121.49, Defendant Oliver owned over $3.53 million worth of RTX stock.

32.     For the 2024 Fiscal Year, Defendant Oliver received $325,495 in total compensation from the Company.

### Defendant Ortberg

33.     Defendant Ortberg has served as Company director since 2020. He also serves as a member of the Finance Committee and the Special Activities Committee. From 2020 to February 2021, Defendant Ortberg served as Special Advisor to the Office of the CEO, Raytheon Technologies Corporation. According to the 2023 Proxy Statement, as of February 8, 2023, Defendant Ortberg beneficially owned 299,851 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 8, 2023 was $97.65, Defendant Ortberg owned over $29.28 million worth of RTX stock as of that date.

34.     For the 2024 Fiscal Year, Defendant Ortberg received $325,495 in total compensation from the Company.

### Defendant O' Sullivan

35.     Defendant O'Sullivan served as a Company director from April 2020 until May 2023. She also served as a member of the Governance and Public Policy Committee and as a member of the Special Activities Committee. Prior to the Merger, she served as a Company director from 2017 until April 2020. According to the 2023 Proxy Statement, as of February 8, 2023, Defendant O'Sullivan beneficially owned 12,415 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 8, 2023 was $97.65, Defendant O'Sullivan owned approximately $1.21 million worth of RTX common stock.

36.     For the 2022 Fiscal Year, Defendant O'Sullivan received $311,559 in total compensation from the Company.

### **Defendant Paliwal**

37.     Defendant Paliwal has served as the Company's Lead Director since the Merger in April 2020. He also serves as a member of the Governance and Public Policy Committee and as a member of the Human Capital & Compensation Committee. Prior to the Merger, Defendant Paliwal served as a Company director from 2016 until April 2020. He also served as the Chair of the Governance and Nominating Committee and as a member of the Public Policy and Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of February 8, 2023, Defendant Paliwal beneficially owned 36,073 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 8, 2023 was $97.65, Defendant Paliwal owned over $3.52 million worth of RTX common stock.

38.     For the 2022 Fiscal Year, Defendant Paliwal received $415,650 in total compensation from the Company.

### **Defendant Pawlikowski**

39.     Defendant Pawlikowski has served as a Company director since the Merger in April 2020. She also serves as a member of the Audit Committee and as a member of the Special Activities Committee. Prior to the Merger, Defendant Pawlikowski served as a Company director from March 13, 2018 until April 2020. She also served as a member of the Audit Committee and as a member of the Special Activities Committee. According to the 2025 Proxy Statement, as of February 18, 202, Defendant Pawlikowski beneficially owned 16,791 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

trading on February 18, 2025 was $121.29, Defendant Pawlikowski owned approximately $2.036 million worth of RTX stock.

40.    For the 2024 Fiscal Year, Defendant Pawlikowski received $329,000 in total compensation from the Company.

### Defendant Ramos

41.    Defendant Ramos has served as a Company director since the Merger in April 2020. She also serves as a member of the Audit Committee and as a member of the Finance Committee. Prior to the Merger, Defendant Ramos served as a Company director from 2018 until April 2020. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Ramos beneficially owned 25,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Ramos owned over $3.06 million worth of RTX stock.

42.    For the 2024 Fiscal Year, Defendant Ramos received $326,925 in total compensation from the Company.

### Defendant Reynolds

43.    Defendant Reynolds has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Audit Committee and as a member of the Governance and Public Policy Committee. Prior to the Merger, Defendant Reynolds served as a director of United Technologies Corporation from 2016 to April 2020. According to the 2023 Proxy Statement, as of February 18, 2025, Defendant Reynolds beneficially owned 44,563 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Reynolds owned over $5.41 million worth of RTX stock.

44.    For the 2024 Fiscal Year, Defendant Reynolds received $401,925 in total compensation from the Company.

**Defendant Rogers**

45.    Defendant Rogers has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Finance Committee and as a member of the Human Capital & Compensation Committee. Prior to the Merger, Defendant Rogers served as a member of the United Technologies Corporation Board from 2016 to April 2020. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Rogers beneficially owned 38,899 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Rogers owned over $4.7 million worth of RTX stock.

46.    For the 2024 Fiscal Year, Defendant Rogers received $376,925 in total compensation from the Company.

**Defendant Winnefeld**

47.    Defendant Winnefeld has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Special Activities Committee, as a member of the Compensation Committee, and as a member of the Governance and Public Policy Committee. Prior to the Merger, Defendant Winnefeld served as a Company director from 2017 until April 2020. He also served as the Chair of the Special Activities Committee, as a member of the Audit Committee, and as a member of the Management Development and Compensation Committee. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Winnefeld beneficially owned 44,563 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on February 18, 2025 was $121.49, Defendant Winnefeld owned over $5.4 million worth of RTX shares.

48.    For the 2024 Fiscal Year, Defendant Winnefeld received $378,540 in total compensation from the Company.

**Defendant Work**

49.    Defendant Work has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Governance and Public Policy Committee, as a member of the Audit Committee, and as a member of the Special Activities Committee. Prior to the Merger, Defendant Work served as a Company director from 2017 until April 2020. He also served as a member of the Audit Committee, Public Policy and Corporate Responsibility Committee, and as a member of the Special Activities Committee. According to the 2025 Proxy Statement, as of February 18, 2025, Defendant Work beneficially owned 20,323 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2025 was $121.49, Defendant Work owned over $2.47 million worth of RTX stock.

50.    For the 2024 Fiscal Year, Defendant Work received $356,795 in total compensation from the Company.

**THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

51.    By reason of their positions as officers, directors, and/or fiduciaries of RTX and because of their ability to control the business and corporate affairs of RTX, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RTX in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RTX and its shareholders.

52.     Each director and officer of the Company owes to RTX and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RTX, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

54.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

55.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and

16

a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

58.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of RTX was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.    Each of the Individual Defendants aided and abetted and rendered substantial as-
sistance in the wrongs complained of herein. In taking such actions to substantially assist the com-
mission of the wrongdoing complained of herein, each of the Individual Defendants acted with
actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substan-
tially assisted in the accomplishment of that wrongdoing, and was or should have been aware of
his or her overall contribution to and furtherance of the wrongdoing.

## RTX'S CODE OF CONDUCT

60.    RTX's Code of Conduct provides that "[t]he Code applies to all employees, offic-
ers, and directors" and explains that "everyone is expected to follow the Code, and violations can
lead to disciplinary action, including termination."

61.    In a section titled, "Dealing Honestly and Fairly," the Code of Conduct states the
following, in relevant part:

> Our reputation for integrity and honesty builds trust with customers and partners.
> Truthful communication about our products and services ensures we meet commit-
> ments and provide candid assessments. Fairness with business partners strengthens
> relationships, helping us deliver safe, reliable products. Competitors respect our
> commitment to fair competition.
>
> ***
>
> Dealing honestly and fairly in the marketplace means that we:
>
> - Market and sell our products truthfully, based on their merits.
> - Maintain integrity in bidding and negotiate contracts in good faith.
> - Do not engage in collusive behaviors like bid rigging or price fixing.
> - Focus on positive attributes of our products and do not disparage competitors.
>
> ***
>
> - Comply with all applicable laws and regulations.
> - Ensure representatives, consultants, and partners follow these standards.

62.    In a section titled, "Serving Government Customers," the Code of Conduct states
in relevant part:

We work closely with many government entities worldwide, following specific rules and regulations for contracts, pricing, and deliverables. By competing fairly and complying with all requirements, we serve our government customers well and build their confidence in us as a reliable supplier.

\*\*\*

Serving government customers means that we:

- Take the time to learn the rules, ask questions and seek out guidance.
- Understand and confirm our ability to comply with all requirements before entering into contracts, and complying with those requirements throughout performance.
- When disclosure is required, ensure cost or pricing data are current, accurate, and complete.
- Engage constructively with government customers regarding contract performance.
- Account for contract costs (including employee time-charging) accurately.
- Comply with restrictions on gifts, gratuities, employment offers, etc., to government officials and their relatives.
- Protect classified information and promptly report escapes or threats.
- Safeguard government property through proper storage, tracking, labeling, and security measures.

63.    In a section titled, "Competing Fairly and Legally," the Code of Conduct states in

relevant part:

Competition drives us to be more efficient and innovative, benefitting us and our customers with better value. Anticompetitive practices distort the marketplace, which can lead to higher prices and poor-quality products. They also harm government customers and taxpayers. We compete fairly and legally because it's the right thing to do and protects our reputation.

\*\*\*

Competing fairly and legally means that we:

- Act independently and not in coordination with competitors, unless there is a legitimate business arrangement, such as a joint venture or teaming relationship.
- Never share bid details with other unless lawful and necessary.
- Seek approval before participating in trade associations and other groups that require frequent contacts with competitors.
- Consult Legal before engaging in practices that could harm competition.

19

- Report competition concerns to Ethics & Compliance or Legal.

64. In a section titled, "Doing Business Globally," the Code of Conduct states the following, in relevant part:

> RTX's civil and military products and technologies (including date and software) are vital to the national security of the United States and to the countries were we operate and do business. As a global company with customers, suppliers, partners, employees and regulators worldwide, we must follow all applicable export and import controls, sanctions, and U.S. anti-boycott laws. Meeting our trade compliance obligations helps ensure that our products, technologies, and services go where they are supposed to go and compliantly and that they are used appropriately. Failure to comply can violate the public trust and damage RTX's reputation.

> ***

> Meeting our trade compliance obligations means that we:

> - Identify and correctly classify products and technologies.
> - Mark controlled items appropriately.
> - Safeguard products and technology.
> - Screen all parties to transactions against sanctioned country and restricted party lists.
> - Ensure appropriate authorizations are in place for exports, re-exports, retransfers and imports prior to the transfer.
> - Manage authorizations and maintain accurate records.
> - Correctly value imported goods.
> - Appropriately report fees and commissions paid to representatives or consultants.
> - Avoid boycott-related activities and report boycott requests.

65. In a section titled, "Avoiding Conflicts of Interest" the Code of Conduct states the following, in relevant part:

> We never let personal interests interfere with RTX's decisions. Good judgment helps us maintain excellence and innovate without distraction. Even the appearance of a conflict can be harmful, so we promptly disclose and manage conflicts

> ***

> Avoiding conflicts of interest means that we:

> - Identify potential conflicts proactively.
> - Comply with conflict-of-interest laws and regulations.

- Disclose conflicts according to policy.
- Remove ourselves from decisions where conflicts exist.
- Avoid decisions influenced by personal gain or relationships.
- Win business based on trust, not inappropriate gifts.
- Stay loyal to RTX and avoid using company resources for personal gain.
- Give our best effort at work without outside job distractions.

66.     In a section titled, "Creating, Maintaining, and Disclosing Accurate Books and Records," the Code of Conduct states in relevant part:

> We keep accurate books and records, which is required by law and helps us to operate effectively and provide timely and truthful information to those who rely on it.
>
> ***
>
> Accurate record-keeping upholds RTX's commitment to financial integrity, quality and safety. Complete and accurate records enable sound business decisions and protect our reputation for truthfulness. Misstating financial results can lead to serious penalties.

67.     In a section titled, "Preventing Insider Trading," the Code of Conduct states the following, in relevant part:

> We never use or share inside information about RTX or other companies for the purpose of trading securities.
>
> We may access information useful to investors through our work. Protecting this information honors our value of trust. Insider trading is illegal and provides an unfair advantage.

68.     The Individual Defendants violated the Code of Conduct when they conducted little, if any, oversight of RTX's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and the aiding and abetting thereof. Furthermore, Defendants Ortberg and Atkinson violated the Code

of Conduct by engaging in insider trading. The Individual Defendants further violated the Code of Conduct by failing to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**RTX'S AUDIT COMMITTEE CHARTER**

69.     RTX also maintains an Audit Committee Charter (the "Charter"). Regarding the purpose of the Audit Committee, the Charter states the following:

> The Audit Committee ("Committee") is appointed by the Board of Directors ("Board") of RTX Corporation ("Company") to assist the Board in its oversight responsibilities relating to: the integrity of the Company's financial statements; the independence, qualifications and performance of the Company's internal and external auditors; the Company's compliance with its policies and procedures, internal controls, Code of Conduct and applicable laws and regulations; policies and procedures with respect to risk assessment and management; and such other responsibilities as delegated by the Board from time to time. The Committee provides the opportunity for an open and candid dialog on these issues among the Committee members, management, the independent auditor, and the internal auditor.

> The Committee shall prepare the report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement.

70.     Regarding "Financial Statements and Disclosure Matters," the Charter states the following, in relevant part:

> 1.     Meet to review and discuss with management and the independent auditor the annual audited financial statements, including review of the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also recommend to the Board whether the audited financial statements should be included in the Company's Report on Form 10-K.

> 2.     Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Report on Form 10-Q, including review of the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also review the results of the independent auditor's review of the quarterly financial statements.

3.    Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

4.    Review and discuss on a timely basis with the independent auditor:

    (a) Critical accounting policies and practices used, including any significant changes.

    (b) Alternative treatments of significant financial information within generally accepted accounting principles that have been discussed with management, including the effects of alternatives and the preferred method of the independent auditor.

    (c) Other significant communications between the independent auditor and management, including any unusual transactions, management letters, or accounting adjustments proposed by the independent auditor that were waived by management as immaterial or otherwise.

5.    Review the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings expectations provided to analysts and rating agencies.

6.    Discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

7.    Review overall policies and practices for enterprise risk management, including delegation of oversight for particular areas of risk to the appropriate Board committees. Discuss with management the Company's major financial risk exposures as well as significant operational, compliance, reputational, strategic and cybersecurity risks, and the steps management has taken to monitor and manage such exposures to be within the Company's risk tolerance.

8.    Discuss with the independent auditor the matters required to be communicated by the Public Company Accounting Oversight Board's (PCAOB) Auditing Standard No. 1301, Communications with Audit Committees, including any problems or difficulties encountered during the audit and management's response.

9.    Discuss the adequacy and effectiveness of the Company's internal controls with management, the independent auditor and the internal auditor in conjunction with the Company's CEO and CFO certification process for the Reports on Form 10-K and Form 10- Q, including any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting and additional management procedures and audit steps performed in light of any

material control deficiencies.

71.    Regarding "Compliance Oversight Responsibilities," the Charter states the following, in relevant part:

1.    Oversee and review the Company's legal, ethical and regulatory compliance program, including the Company's business conduct guidelines, and review at least annually the implementation and effectiveness of the program.

2.    Discuss any illegal acts discovered by the independent auditor during the course of its work and its conclusions with respect to such illegal acts or obtain assurance from the independent auditor that none were discovered.

3.    Obtain reports from management, the senior compliance officer and the Company's internal auditor on any significant issues regarding compliance with applicable laws and regulations and with the Company's Code of Conduct. Receive periodic updates by the General Counsel and senior compliance officer on any pending investigations of potentially significant alleged violations of laws, regulations or company policies.

4.    Establish procedures for and oversee the receipt, retention and treatment of complaints received by the Company regarding: (i) accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by the Company's employees, shareowners and other interested persons of concerns regarding questionable accounting or auditing matters, and business practices.

5.    Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise potentially material issues regarding the Company's financial statements or accounting policies.

6.    Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits, to determine that the Company's financial statements are complete and accurate or to determine that such statements are in accordance with generally accepted accounting principles. It is also not the duty of the Committee to conduct investigations or to assure compliance with laws and regulations and the Company's policies and procedures. These are the responsibilities of management, the independent auditor or others retained by the Committee.

## SUBSTANTIVE ALLEGATIONS

72.    RTX is an aerospace and defense company incorporated in Delaware and based in Virginia and is a global provider of high technology products and services in the aerospace industry. RTX's operations are classified into four principal business units: (1) Pratt & Whitney; (2) Collins Aerospace Systems; (3) Raytheon Intelligence & Space; and (4) Raytheon Missiles & Defense;

73.    Pratt & Whitney is globally recognized as one of the "big three" aero-engine manufacturers. Pratt & Whitney develops, designs, and manufactures aircraft engines for both civil and military aviation. Pratt & Whitney touts its focus on developing forward-thinking engines that have transformed global travel, and boasts that its signature Geared Turbofan ("GTF") engine family is an industry-leader in fuel efficiency and sustainability benefits. GTF engines are used in common commercial airline planes like the Airbus A320neo and the Airbus A220.

**False and Misleading Statements Issued During the Relevant Period**

**The 2020 10-K**

74.    The Relevant Period began on February 8, 2021, when RTX filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Hayes, O'Brien, Atkinson, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work and contained certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Hayes and O'Brien, attesting to the accuracy of the statements contained therein.

75.    The 2020 10-K represented the following about Pratt & Whitney and its GTF engines:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest customer by sales is Airbus, with sales, prior to discounts and incentives, of 30%, 31% and 36% of total Pratt & Whitney segment sales in 2020, 2019 and 2018, respectively.

Pratt & Whitney produces the PW1000G Geared Turbofan engine family, the first of which, the PW1100G-JM, entered into service in January 2016. **The PW1000G Geared Turbofan engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines. The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft.** PW1000G Geared Turbofan engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft and have been selected to power the new Irkut MC-21 passenger aircraft. Mitsubishi and Pratt & Whitney have signed a contract in recognition of the formal pause in MRJ70 and MRJ90 engine development for the SpaceJet program. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's new G500 and G600 business jets, as well as to power Dassault's new Falcon 6X business jet, which is scheduled to enter into service in 2022.

***

**In 2020, Pratt & Whitney reached significant milestones on the Geared Turbofan (GTF) engine program, including achieving an industry-leading engine dispatch reliability rate of 99.98% for the GTF engines for the Airbus A320neo.[2]** The GTF engine family now powers more than 900 aircraft across 50 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2 family. Pratt & Whitney also delivered the 50,000th PT6 turboprop engine in the General Aviation segment. Also in 2020, Pratt & Whitney received a significant number of contract awards for the F135 program, which powers all three variants of the F-35 Lightning II fighter aircraft. F135 production milestones achieved included the delivery of the 600th and 700th production engines. From a sustainment perspective, the F135 team supported the activation of half a dozen bases and ships around the world, including the first U.S. Navy aircraft carrier ready to deploy with F-35C aircraft on board. Significant activity continues on Adaptive Engine Transition Program, 6th-gen propulsion, and other development programs.

76.     The 2020 10-K provided the following risk disclosures related to the GTF engine production:

**We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially**

---

[2] (Emphasis Added).

**Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.[3]**

We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services.

**Of particular note, Pratt & Whitney is currently producing and delivering the PW1000G Geared Turbofan engine to power various aircraft, including the A320neo family of aircraft.[4]** The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

Our ability to realize the anticipated benefits of our technological advancements depends on a variety of factors, including meeting development, production, certification and regulatory approval schedules; receiving regulatory approvals; execution of internal and external performance plans; availability of supplier and internally produced parts and materials; performance of suppliers and subcontractors; availability of supplier and internal facility capacity to perform maintenance, repair and overhaul services on our products; hiring and training of qualified personnel; achieving cost and production efficiencies; identification of emerging technological trends for our target end-customers; validation of innovative technologies; risks associated with the development of complex software; the level of customer interest in new technologies and products; and customer acceptance of products we manufacture or that incorporate technologies we develop. For example, our customers manufacture end products and larger aerospace systems that incorporate certain of our aerospace products. These systems and end products may also incorporate additional technologies manufactured by third parties and involve additional risks and uncertainties. As a result, the performance and industry acceptance of these larger systems and end products could affect the level of customer interest in and acceptance of our products in the marketplace.

77.     The foregoing statements contained in 2020 10-K were materially false and/or

misleading because they misrepresented and failed to disclose adverse facts pertaining to the

---

[3] (Emphasis in Original).
[4] (Emphasis Added).

27

Company's business, operations, and prospects. Specifically, Defendants made false and/or mis-leading statements and/or failed to disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, impacting its customers and harming its business; and (3) RTX failed to maintain internal controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The 2021 Proxy Statement**

78.      On March 12, 2021, RTX filed a proxy statement with the SEC via Schedule 14A (the "2021 Proxy Statement"). Defendants Hayes, Atkinson, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Reynolds, Rogers, Winnefeld, and Work solicited the 2021 Proxy Statement.

79.      The 2021 Proxy Statement solicited shareholders to approve, among other things: (1) the reelection of director Defendants Hayes, Atkinson, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work to the Board; (2) an advisory vote on the company's executive compensation; (3) the appointment of PWC to serve as to the Company's independent auditor for 2021; (4) approve the Raytheon Technologies Executive Annual Incentive Plan (the "Plan")[5] and (5) an amendment to the Plan to increase the number of shares eligible to be issued to the Company's officers and directors thereunder by 75 million additional shares.

80.      The 2021 Proxy Statement stated the following with respect to risk oversight:

Our risk management program covers the full range of significant risks to RTX, including legal, compliance, financial, operational, strategic and reputational risks. Within these broad categories, specific risks include human capital, market

---

[5] The 2021 Proxy Statement defines the "Plan" as the "Raytheon Technologies Corporation 2018 Long-Term Incentive Plan." Therefore, proposals (4) and (5) of the 2021 Proxy Statement function as proposed amendments to the terms of the preexisting plan.

conditions, the overall political climate, cybersecurity, and the impact of disruptive events such as pandemics and natural disasters.

To manage these risks, RTX has a comprehensive enterprise risk management ("ERM") program that conforms to the Enterprise Risk—Management Integrated Framework established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

Under our ERM program, each business unit president is responsible for identifying and reporting the following:

- Notable business and compliance risks that could affect the business unit's operating plan and strategic initiatives
- Assessment of the likelihood and potential impact of the most significant risks
- Plans to mitigate the most significant risks

In addition, functional leaders are responsible for identifying and reporting notable business and compliance risks related to their areas of responsibility. Senior management then reviews and prioritizes the business unit and functional area risks, including identifying the most significant risks on an enterprise-wide basis.

81.      The 2021 Proxy Statement also stated the following regarding the Board's commitment to the Code of Conduct.

**Our Continuing Commitment to Sound Corporate Governance**

RTX is committed to strong corporate governance practices that are designed to maintain high standards of oversight, accountability, integrity and ethics and go beyond legal and regulatory requirements. The Board believes this commitment promotes long-term shareowner value. As a company formed through the "merger of equals" transaction between UTC and RTN, we have governance standards that incorporate the values and leading practices of both legacy companies. This is reflected in strong Board engagement on diversity, equity and inclusion as well as sustainability disclosure, and a commitment to transparent financial reporting and strong internal controls. Our new Code of Conduct and amended Governance Guidelines also reflect these high standards.

The new Code of Conduct, adopted by the Board in 2020, harmonizes the legacy companies' codes based on RTX's values of Trust, Respect, Accountability, Collaboration and Innovation. Among other things, it emphasizes conducting our business with integrity, respecting and protecting human rights, and reporting violations without fear of retaliation.

The Board also amended the RTX Governance Guidelines to incorporate the following governance practices of legacy RTN:

• **Stricter overboarding limits:** Reflecting its expectations regarding a director's commitment of time and attention to RTX, the Board lowered the number of public company boards on which a director may serve from five to four (including RTX), and to two for any director who serves as executive officer of a public company.

• **Approval of outside engagements:** The Board clarified its approval process for outside directorships and formalized the review of paid consulting/advisory engagements that could potentially raise conflicts of interest for a director.

• **Board refreshment and development:** The Board instituted a periodic review of director tenure, with special attention to directors who have served for 15 or more years. It also clarified its practices regarding appropriate attributes and experiences for the role of each committee chair, and made it a goal to rotate committee chairs and members at least every five years.

Elements of the current RTX governance structure, including the composition and leadership of the Board and its committees, were established in connection with the Merger and approved by the respective legacy companies' shareowners. The Board believes the RTX governance structure is sound and enables it to provide advice, insight and strong independent oversight that will advance the interests of the combined company, our shareowners, and other stakeholders.

82.  RTX represented to shareholders that the purpose of the Plan was to allow RTX to "[a]ttract, retain and motivate executives who are key to the success of the Company; [p]romote the achievement of annual performance goals that we wish to reinforce; and [e]nsure a strong linkage of pay to performance." The  Plan is administered by the Compensation Committee of the Board with the "sole discretion to administer the [Executive] Plan and to exercise all powers and authorities that are granted to it under the [Executive] Plan[.]"

83.  The 2021 Proxy Statement stated the following regarding the Plan.

The Board strongly believes that the Plan benefits our shareowners. It has served, and will continue to serve, its intended purposes, which are:

• To align shareowner and management interests. The Plan enables RTX to create equity-based compensation opportunities that correlate with shareowner value.
• To drive long-term, sustainable growth. The Board believes that equity incentive award opportunities focus management on long-term, sustainable

performance and have helped RTX achieve a 96% cumulative total shareowner return over the 10-year period ending on December 31, 2020.

- To enable RTX to benefit from top talent. The Plan supports RTX's ability to attract, retain and motivate a qualified and talented employees, which has enabled us to maintain our competitive advantage.

84.     Moreover, the Board sought the authorization of 75 million additional shares for future issuance under the Plan. In addition, the Board sought to extend the Plan until April 26, 2031, therefore benefitting RTX's officers and directors by allowing them to receive compensation pursuant to the Plan in the future. The Plan establishes a $1.5 million cash retainer fee cap for amounts to be received under the Plan annually for non-employee directors.

85.     The 2021 Proxy Statement was false and misleading because, in truth, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public. The 2021 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Individual Defendants disregarded their duty to perform risk oversight.

86.     The 2021 Proxy Statement also failed to disclose materially adverse facts about RTX's business, operations, and prospects. Specifically, the 2021 Proxy Statement failed to disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, which impacted its customers and harmed its business; and (3) RTX failed to maintain internal controls. As a result, the Defendants' statements about RTX's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

87.     As a result of Defendants Hayes, Atkinson, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work causing the 2021 Proxy Statement

to be false and misleading, RTX's shareholders approved the proposals set forth in the 2021 Proxy Statement, including, among other things: (1) the reelection of Defendants Hayes, Atkinson, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) the Plan rewarded the Individual Defendants, such as Defendants Hayes and Mitchill for their misconduct; and (3) the Plan authorized the issuance of over 75 million additional shares, which the RTX's officers and directors (including the Individual Defendants and Directors) stood to materially benefit from in the future. Had shareholders been aware of the true state of RTX at the time, they likely would not have approved those Board proposals.

**The 2021 10-K**

88.    On February 11, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). Attached to the 2021 10-K were certifications pursuant to SOX signed by Defendant Hayes. The certifications attested to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2021 10-K was signed by Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld and Work.

89.    The 2021 10-K described Pratt & Whitney as follows:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 31%, 30% and 31% of total Pratt & Whitney segment sales in 2021, 2020 and 2019, respectively.

**Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to**

**legacy engines.** The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E Jet E2 family of aircraft and have been certified by the Russian civil aviation authority to power the Irkut MC-21passenger aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2022.

***

**The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with third parties.** At December 31, 2021, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged, in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

**In 2021, Pratt & Whitney reached significant milestones on the GTF engine program, including the first flight of the GTF Advantage engine for the A320neo family. The GTF Advantage configuration further extends the economic and environmental benefits of the existing GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family.** The GTF family now powers more than 1,100 aircraft across 58 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2. Also in 2021, Pratt & Whitney's V2500 program achieved 250 million flight hours. Pratt & Whitney was announced as the engine provider on the Dassault Falcon 6X and Gulfstream G400, representing two new platforms for its PW800 engine. [. . .]

90.     The 2021 10-K contained the following risk disclosure regarding GTF engine production:

**We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.** We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we

invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services. Of particular note, Pratt & Whitney is currently producing and delivering the Geared Turbofan engine to power various aircraft. The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

91.     The above statements were materially false and misleading because in truth, the GTF engines were affected by quality control issues, which would later require a recall from service. As a result, the Defendants' statements about RTX's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The 2022 Proxy Statement**

92.     On March 14, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work solicited the 2022 Proxy Statement. The 2022 Proxy Statement solicited shareholders to approve, *inter alia*: (1) the election of thirteen directors to the Board, including Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work to the Board; (2) an advisory vote on the Company's executive compensation; and (3) the appointment of PWC to be the Company's independent auditor for 2022.

93.     The 2022 Proxy Statement stated the following in regard to risk oversight:

Our Board provides active and independent oversight and guidance to management regarding the Company's long-term strategy and priorities, risk management, CEO and senior management succession planning and ESG, as well as other aspects of our business and affairs. Further, the Board has adopted robust governance practices to enhance its effectiveness and is engaged on behalf of our shareowners.

As part of its oversight role, the Board annually reviews the Company's long-term plan and objectives and those of its four business units and engages in periodic discussions of strategic matters, including significant business portfolio transformation transactions. It also receives regular updates on management's progress and execution of the Company's strategy and reviews and approves the Company's annual operating plan.

In 2021, our Board worked closely with management to provide effective oversight of management's execution on key priorities that underpin our business strategy, including our COVID-19 pandemic response, our focus on operational excellence, our strategic investments in technology and innovation, the management of our business portfolio, and the advancement of our ESG commitments. The Board and its committees also provided strong oversight in other important areas as discussed below.

94.     The 2022 Proxy Statement further explained that the Board is "[r]esponsible for Board/committee risk oversight governance, including allocation of risk oversight responsibilities[.]" Moreover, the 2022 Proxy Statement noted that the full Board is responsible for "[m]ajor strategic risks, such as significant litigation, and pandemics[,] succession planning[,] [and] government relations[.]"

95.     Regarding the Board's adherence to the Code of Conduct, the 2022 Proxy Statement stated that the Board "believes [the] commitment to sound corporate governance" promotes long-term shareowner value and noted that "[t]his commitment to sound governance is reflected in [the Company's] Code of Conduct[.]" Additionally, the 2022 Proxy Statement stated that the Code of Conduct "[e]xplains how our values of Trust, Respect, Accountability, Collaboration and Innovation must inform our actions[;] [g]uides employees' conduct with each other, our business partners and our communities[;]" and "[e]mphasizes the responsibility to conduct our business with integrity, to respect and protect human rights, and to report violations of the Code without fear of retaliation."

96.     The 2022 Proxy Statement was false and misleading because, in truth, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of

Conduct, including by allowing false and misleading statements to be issued to the investing public. The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Individual Defendants disregarded their duty to perform risk oversight.

97.     The 2022 Proxy Statement also failed to disclose materially adverse facts about RTX's business, operations, and prospects. Specifically, the 2022 Proxy Statement failed disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, which impacted its customers and harmed its business; and (3) RTX failed to maintain internal controls. As a result, the Defendants' statements about RTX's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

98.     On February 7, 2023, the Company filed its Annual Report with the SEC on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K contained certifications pursuant to SOX, signed by Defendant Hayes, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2022 10-K was signed by Defendants Atkinson, Caret, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld and Work.

99.     The 2022 10-K stated the following regarding Pratt & Whitney and its engines:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 33%, 31% and 30% of total Pratt & Whitney segment sales in 2022, 2021 and 2020, respectively.

Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines.

The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E Jet E2 family of aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2023.

***

The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with third parties. At December 31, 2022, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged, in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

**In 2022, Pratt & Whitney reached significant milestones on the GTF engine program, including surpassing a billion gallons of fuel saved and 10 million metric tons of carbon emissions avoided since entry into service. The GTF Advantage engine for the A320neo family began Federal Aviation Regulations Part 33 (FAR33) certification and development flight testing on the A320neo aircraft, and successfully ran on 100% sustainable aviation fuel (SAF). The GTF Advantage configuration extends the economic and environmental benefits of today's GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family. The GTF family now powers more than 1,400 aircraft across 64 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2.[6]** The year also saw the entry into service of multiple new platforms, including the Cessna SkyCourier, Daher Kodiak 900 and TBM960, and ATR's next generation 42 & 72 aircraft powered by the new PW127XT-M engines, with Transport Canada engine certifications of the PW127XT-M, PW812GA and PW812D engines to power the ATR 72-600 regional turboprop, Gulfstream G400 and Dassault Falcon 6X aircraft respectively.

100.     The above statements were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations,

---

[6] (Emphasis Added).

and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, impacting its customers and harming its business; and (3) RTX failed to maintain internal controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The 2023 Proxy Statement**

101.    On March 13, 2023, the Company filed a proxy statement with the SEC via Schedule 14A (the "2023 Proxy Statement"). Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work solicited the 2023 Proxy Statement. The 2023 Proxy Statement solicited shareholders to approve, among other things: (1) the election of thirteen directors to the Board, including Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work to the Board; (2) an advisory vote on the Company's executive compensation; (3) an advisory vote on the frequency of shareowner votes on executive compensation; (4) the appointment of PWC as RTX's independent auditor for 2023; and (5) an amendment to the restated Certificate of Incorporation to eliminate personal liability of officers for monetary damages for breach of fiduciary duty as an officer.

102.    The 2023 Proxy Statement stated the following regarding the Board's role in risk oversight:

> Our Board provides active and independent oversight and guidance to management regarding the Company's long-term strategy and priorities, risk management, CEO and senior management succession planning, and ESG, as well as other aspects of our business and affairs. In addition, the Board has adopted robust governance

practices to enhance its effectiveness and is engaged on behalf of our shareowners.

As part of its oversight role, the Board:

● Annually reviews the Company's long-term plan and objectives and those of its business units
● Engages in ongoing discussions of near-, medium- and long- term risks and strategic matters, including the geopolitical environment, economic conditions, industry trends and developments, and their impacts on our business, as well as strategic challenges and opportunities
● Is regularly briefed on assessments of the Company's business portfolio and is engaged in the Company's mergers, acquisitions, divestitures, and other corporate development activities
● Receives regular updates on management's progress and execution of the Company's strategy and reviews and approves the Company's annual operating plan
● Periodically receives briefings from outside advisors and counsel on strategic, financial, legal and compliance, and other matters

In 2022, our Board worked closely with management to provide effective oversight of execution on key priorities that underpin our business strategy, including:

● Our response to a range of challenges presented by the Ukraine conflict and the geopolitical environment and inflation
● Our execution of ESG-related initiatives in furtherance of our ESG strategy and vision
● Our risk management efforts, with a particular focus on cybersecurity, product safety and compliance risks
● Our shareowner engagement efforts
● CEO and senior management succession planning
● Our focus on operational excellence and financial performance
● Our strategic investments in technology and innovation
● Meeting our commitment to return capital to investors

103.    The 2023 Proxy Statement explained that the Board was also "[r]esponsible for Board/committee risk oversight governance, including allocation of risk oversight responsibilities." Moreover, the 2023 Proxy Statement noted that the full Board is responsible for "[m]ajor strategic risks, such as significant litigation, and pandemics[,] [s]uccession planning[,] [and] [g]overnment relations[.]"

104.    The 2023 Proxy Statement further stated that the Board "believes [the commitment to sound corporate governance] promotes long-term shareowner value" and noted that "[t]his

commitment to sound governance is [] reflected in [the Company's] Code of Conduct[.]" The 2023

Proxy Statement further stated the following regarding the Code of Conduct:

> This commitment to sound governance is also reflected in our Code of Conduct, which reinforces our values and high standards by:
>
> ● Explaining how our values of Trust, Respect, Accountability, Collaboration and Innovation must inform our actions
> ● Guiding employees' conduct with each other, our business partners and our communities
> ● Emphasizing the responsibility to conduct our business with integrity, to respect and protect human rights, and to report violations of the Code without fear of retaliation

105.    Interestingly, the 2023 Proxy Statement stated the following with respect to a proposal to eliminate personal liability of officers for monetary damages for breach of fiduciary duty:

> Why We Propose to Eliminate the Personal Liability of RTX's Officers For Monetary Damages For Breach of Fiduciary Duty as an Officer. The Board is committed to attracting and retaining talented officers, addressing developments in the law, and good corporate governance practices. The new Delaware legislation only permits, and our proposed amendment would only permit, exculpation for direct claims brought by shareowners but would not eliminate officers' monetary liability for breach of the duty of care claims brought by the Company itself or for derivative claims made by shareowners on behalf of the Company. The amendment would not limit the liability of officers for: any breach of the duty of loyalty, any acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, and any transaction from which the officer derived an improper personal benefit.
>
> Therefore, taking into account the narrow class and type of claims for which officers' liability would be exculpated, consistent with the protection in the Certificate currently afforded our directors, and the benefits the Governance Committee believes would accrue to the Company and its shareowners in the form of an enhanced ability to attract and retain talented officers, the Governance Committee recommended to the Board an amendment to the Certificate to provide such exculpation to the extent permitted by Delaware law. Based on this recommendation, the Board adopted a resolution on February 3, 2023, authorizing and declaring it advisable and in the best interests of the Company to amend the Certificate to limit the scope of officer liability and recommended the submission of this amendment for shareowner approval at the 2023 Annual Meeting.

106.    Notably, Defendant Hayes, Atkinson, Harris, Oliver, Ortberg, Paliwal, Pawlikow-ski, Ramos, Reynolds, Rogers, Winnefeld, and Work solicited shareholders to approve this proposal while they and the other Individual Defendants were actively breaching their fiduciary duties to RTX. Shareholders would likely not have approved this proposal had they known the true state of affairs at RTX or had they been aware of the repeated misconduct engaged by the Individual Defendants as they simultaneously proposed their own exculpation.

107.    The 2023 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public. The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Individual Defendants disregarded their role in risk oversight.

108.    The 2023 Proxy Statement also failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, impacting its customers and harming its business; and (3) the Company failed to maintain internal controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

109.    As a result of Defendants Hayes, Atkinson, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (1) the reelection of each of them to the Board; (2) approving

executive compensation; and (3) amending the Restated Certificate of Incorporation to eliminate personal liability of officers for monetary damages for breach of fiduciary duty as an officer.

## THE TRUTH BEGINS TO EMERGE

110.    On July 25, 2023, *Reuters* published an article titled "RTX shares tumble on Pratt & Whitney airliner problem." The article disclosed that RTX's stock price had dropped "10% . . . as it  said more than 1,000 engines must [be] removed from Airbus planes and checked for microscopic cracks." The article noted that the engine failures were the result of a "rare condition" in the powdered metal used in the engines which meant that "1,200 of more than 3,000 engines . . . have to be taken off and inspected for micro cracks that would point to fatigue." The article further disclosed that "[q]uestions remained over the cash impact to" to RTX.

111.    On this news, RTX's share price $9.91 per share, or 10.2%, from a closing price of $97.01 per share on July 24, 2024, to close at a price of 87.10 per share on July 25, 2024.

112.    Nevertheless, even as this news came to light, the Individual Defendants continued to issue false and misleading statements to investors on behalf of the Company. For example, on the Company's earnings call for the second quarter of 2023 (the "Q2 2023 Earnings Call"), RTX represented that its quality control issues would force the Company to inspect 1,200 potentially affected issues and reduce the Company's cash flow by $500 million in 2023.

113.    The above statement was materially false and/or misleading because it misrepresented and/or failed to disclose the extent of the liability the Company was facing as a result of issues within the GTF engines.

## THE TRUTH FULLY EMERGES

114.    The truth fully emerged on September 11, 2023, when RTX issued a press release that fully revealed the extent of the liability it faced as a result of the manufacturing failures of the

GTF engines. A series of articles published that day revealed that the GTF engine failures had a much larger financial impact on RTX than the Company had previously disclosed. For example, the *Wall Street Journal* published an article titled "RTX Engine Recall to Cut Profit by Up to $3.5 Billion," the article explained that it would "cost [RTX] up to $7 billion to repair Pratt & Whitney engines and compensate airlines for fixes that will ground more than 600 Airbus jets for inspection in 2024." The *Wall Street Journal* further explained that RTX's "profit will take up to a $3.5 billion hit from the recall of hundreds of engines over the next several years," ultimately far greater financial liability for RTX than the Defendants originally represented in July 2023. Likewise, a *Financial Times* article published the same day titled "RTX hit with $3bn charge from Pratt & Whitney aero engine recall" noted that costs the Company incurred as a result of the recalls were "a greater hit than [RTX] initially signaled in July."

115.    Likewise, a Bloomberg article "Pratt Engine Flaw to Idle Hundreds of A320 Planes for Years" reported that the Company "dramatically expanded the scope of required engine checks at its Pratt & Whitney unit" and would "replace as many high-pressure turbine disks as possible with new parts that have a full service life." Under the revised scope, the RTX admitted that 3,000 GTF engines now needed to be inspected, a far greater amount than Defendants' previously reported estimates of 1,200 engines requiring inspection.

116.    On this news, RTX's stock fell $6.58 per share, or 7.9 percent, from a closing price of $83.48 per share on September 8, 2023, to close at a price of $76.90 per share on September 11, 2023.

117.    In light of these revelations, the statements contained in the 2020, 2021, and 2022 10-K's were materially false and misleading as they mispresented and failed to disclose that the GTF engines had been affected by quality control issues that would require RTX to recall and

reinspect many of its GTF airplanes. In causing the Company to make these false and misleading statements and omissions, the Individual Defendants breached their fiduciary duties to the Company.

## THE INDIVIDUAL DEFENDANTS CAUSED RTX TO REPURCHASE ITS OWN COMMON STOCK AT INFLATED PRICES

118.    During the Relevant Period, RTX repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, RTX expended over $5.9 billion re-purchasing approximately 64,747,000 shares of its own stock at prices that did not reflect the actual value of the stock. As a result, RTX overpaid for repurchases during the relevant period.

119.    According to the Form 10-Q the Company filed with the SEC on July 27, 2021 for the quarterly period ended June 30, 2021 (the "2Q 2021 10-Q"), between April 1, 2021 and April 30, 2021, the Company purchased 723,000 shares of its common stock for approximately $59,980,000 at an average price of $82.96 per share.

120.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid approximately $4,381,380 for repurchases of its own stock between April 1, 2021 and April 30, 2021.

121.    According to the 2Q 2021 10-Q, between May 1, 2021 and May 31, 2021, the Company purchased 3,564,000 shares of its common stock for approximately $305,007,120 at an average price of $85.58 per share.

122.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $30,935,520 for repur-chases of its own stock between May 1, 2021 and May 31, 2021.

123.     According to the 2Q 2021 10-Q, between June 1, 2021 and June 30, 2021, the Company purchased 3,158,000 shares of its common stock for approximately $279,798,800 at an average price of $88.60 per share.

124.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $36,948,600 for repurchases of its own stock between June 1, 2021 and June 30, 2021.

125.     According to the Form 10-Q the Company filed with the SEC on October 26, 2021 for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), between July 1, 2021 and July 31, 2021, the Company purchased 1,982,000 shares of its common stock for approximately $168,806,940 at an average price of $85.17 per share.

126.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $16,391,140 for repurchases of its own stock between July 1, 2021 and July 31, 2021.

127.     According to the 3Q 2021 10-Q, between August 1, 2021 and August 31, 2021, the Company purchased 4,604,000 shares of its common stock for approximately $398,476,200 at an average price of $86.55 per share.

128.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $44,428,600 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

129.     According to the 3Q 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company purchased 4,949,000 shares of its common stock for approximately $415,221,100 at an average price of $83.90 per share.

130.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $34,643,000 for repurchases of its own stock between September 1, 2021 and September 30, 2021.

131.    According to the 2021 10-K, between October 1, 2021 and October 31, 2021, the Company purchased 291,000 shares of its common stock for approximately $26,091,060 at an average price of $89.66 per share.

132.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $3,713,160 for repurchases of its own stock between October 1, 2021 and October 31, 2021.

133.    According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 1,927,000 shares of its common stock for approximately $164,912,660 at an average price of $85.58 per share.

134.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $16,726,360 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

135.    According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 1,657,000 shares of its common stock for approximately $137,696,700 at an average price of $83.10 per share.

136.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $10,273,400 for repurchases of its own stock between December 1, 2021 and December 31, 2021.

137.    According to the Form 10-Q the Company filed with the SEC on April 26, 2022 for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), between January 1, 2022

and January 31, 2022, the Company purchased 1,217,000 shares of its common stock for approximately $107,692,330 at an average price of $88.49 per share.

138.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $14,105,030 for repurchases of its own stock between January 1, 2022 and January 31, 2022.

139.    According to the 1Q 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 3,196,000 shares of its common stock for approximately $303,204,520 at an average price of $94.87 per share.

140.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $57,432,120 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

141.    According to the 1Q 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 3,470,000 shares of its common stock for approximately $345,126,200 at an average price of $99.46 per share.

142.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $78,283,200 for repurchases of its own stock between March 1, 2022 and March 21, 2022.

143.    According to the Form 10-Q the Company filed with the SEC on July 26, 2022 for the quarterly period ended June, 2022 (the "2Q 2022 10-Q"), between April 1, 2022 and April 30, 2022, the Company purchased 2,050,000 shares of its common stock for approximately $204,569,500 at an average price of $99.70 per share.

144.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $46,924,500 for repurchases of its own stock between April 1, 2022 and April 30, 2022.

145.     According to the 2Q 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company purchased 5,307,000 shares of its common stock for approximately $494,612,400 at an average price of $93.20 per share.

146.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $86,504,100 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

147.     According to the 2Q 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company purchased 3,807,000 shares of its common stock for approximately $357,325,020 at an average price of $93.86 per share.

148.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $64,566,720 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

149.     According to the Form 10-Q the Company filed with the SEC on October 25, 2022 for the quarterly period ended September 30, 2022 (the "3Q 2022 10-Q"), between July 1, 2022 and July 31, 2022, the Company purchased 3,726,000 shares of its common stock for approximately $346,108,140 at an average price of $92.89 per share.

150.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $59,578,740 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

151.    According to the 3Q 2022 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 1,146,000 shares of its common stock for approximately $107,139,540 at an average price of $93.49 per share.

152.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $19,012,140 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

153.    According to the 3Q 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 1,771,000 shares of its common stock for approximately $148,870,260 at an average price of $84.06 per share.

154.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $12,680,360 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

155.    According to the 2022 10-K, between October 1, 2022 and October 31, 2022, the Company purchased 2,134,000 shares of its common stock for approximately $183,118,540 at an average price of $85.81 per share.

156.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $19,013,940 for repurchases of its own stock between October 1, 2022 and October 31, 2022.

157.    According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company purchased 1,244,000 shares of its common stock for approximately $119,262,280 at an average price of $95.87 per share.

158.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $23,598,680 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

159.     According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company purchased 869,000 shares of its common stock for approximately $86,543,710 at an average price of $99.59 per share.

160.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $19,717,610 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

161.     According to the Form 10-Q the Company filed with the SEC on April 25, 2023 for the quarterly period ended March 31, 2023 (the "1Q 2023 10-Q"), between January 1, 2023 and January 31, 2023, the Company purchased 1,475,000 shares of its common stock for approximately $145,567,750 at an average price of $98.69 per share.

162.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $32,140,250 for repurchases of its own stock between January 1, 2023 and January 31, 2023.

163.     According to the 1Q 2023 10-Q, between February 1, 2023 and February 28, 2023, the Company purchased 1,827,000 shares of its common stock for approximately $181,622,070 at an average price of $99.41 per share.

164.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $41,125,770 for repurchases of its own stock between February 1, 2023 and February 28, 2023.

165.    According to the 1Q 2023 10-Q, between March 1, 2023 and March 31, 2023, the Company purchased 2,616,000 shares of its common stock for approximately $254,719,920 at an average price of $97.37 per share.

166.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $53,549,520 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

167.    According to the Form 10-Q the Company filed with the SEC on July 25, 2023 for the quarterly period ended June 30, 2023 (the "2Q 2023 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 1,796,000 shares of its common stock for approximately $180,893,120 at an average price of $100.72 per share.

168.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $42,780,720 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

169.    According to the 2Q 2023 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 2,769,000 shares of its common stock for approximately $265,131,750 at an average price of $95.75 per share.

170.    As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $52,195,650 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

171.    According to the 2Q 2023 10-Q, between June 1, 2023 and June 30, 2023, the Company purchased 1,472,000 shares of its common stock for approximately $143,210,880 at an average price of $97.29 per share.

172.     As the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, the Company overpaid by approximately $30,014,080 for repurchases of its own stock between June 1, 2023 and June 30, 2023.

173.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $907,235,690.

### DAMAGES TO RTX

174.     As a direct and proximate result of the Individual Defendants' actions, RTX has lost and expended and will continue to lose and expend many millions of dollars.

175.     Such losses include the nearly $907.2 million RTX overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

176.     Such expenditures also include, but are not limited to, the fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

177.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits and other payments provided to Defendants who breached their fiduciary duties to the Company.

178.     As a direct and proximate result of the Defendants' conduct, RTX has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

### THE INDIVIDUAL DEFENDANTS SOLD COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

179.     As a result of the false and misleading statements the Individual Defendants caused RTX to make, the Company's share price was artificially inflated. Defendants Atkinson

and Ortberg, while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling 65,340 shares of RTX common stock for total gross proceeds of approximately $5,599,869, avoiding losses of approximately $575,223. Defendants Atkinson and Ortberg's insider sales, made with knowledge of material, nonpublic information, demonstrate their motive and participating in the wrongdoing.

180.    Specifically, on February 18, 2022, Defendant Atkinson sold 5,340 shares of RTX stock at $93.63 per share for gross proceeds of $499,989. Given that the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, Defendant Atkinson's sale avoided losses of approximately $89,338.

181.    Likewise, on July 15, 2021, Defendant Ortberg sold 60,000 shares of RTX stock at $85.00 per share for gross proceeds of $5,099,880. Given that the Company's stock was actually worth only $76.90 per share, the price at closing on September 11, 2023, Defendant Ortberg's sale avoided losses of approximately $486,000.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

182.    Plaintiff brings this action derivatively in the right of and for the benefit of RTX to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

183.    RTX is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

184.    Plaintiff is an owner of RTX stock and has been a continuous shareholder of Company stock at all relevant times.

185.     Plaintiff will adequately and fairly represent the interests of the Company in en-forcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

186.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

187.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Com-pany's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

188.     The Director Defendants either knew or should have known of the false and mis-leading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

189.     On October 31, 2024, Plaintiff, through Plaintiff's counsel, sent a demand on RTX's Board to investigate the violations of law described herein and to pursue litigation against the Individual Defendants for breaching their fiduciary duties by allowing RTX to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

190.     The Demand outlined alleged misstatements made during the Relevant Period, detailed therein, that there were "materially false and misleading statements in the Company's SEC filings by failing to disclose that: (1) quality control issues had impacted GTF engine produc-tion between at least 2015-2020: (2) as a result, the Company would be required to recall and reinspect many GTF engines; and (3) the Company failed to maintain adequate internal controls."

191.    On January 6, 2025, Plaintiff received a letter on behalf of the Board (the "Demand Refusal Letter"). The Demand Refusal Letter stated that the Board had concluded that resolution of Plaintiff's demand would be premature and instead chose to "defer consideration of the demand pending resolution of the related proceedings and investigations." The Demand Refusal Letter is attached hereto as Exhibit B.

192.    At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Atkinson, Harris, Oliver, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work (the "Director Defendants"). The Board also consisted of non-party directors Leanne G. Caret and Christopher T. Calio.

193.    The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

194.    The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the company neglected to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

195.    The Demand Refusal Letter asserts that the Board's refusal of the demand is reasonable, citing, *inter alia*, the ongoing nature of the Securities Class Action as sufficient cause to refuse the demand. The Demand Refusal Letter does not, however, contain any evaluation of the merits of the Demand, nor does it communicate the Board's conclusions regarding the merits of the Demand.

196.     The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

197.     The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

198.     For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of RTX.

## **CLAIM ONE**

### **Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

199.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

202.    Under the direction and watch of the Director Defendants, the Company's 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) the GTF engines had been impacted by quality control issues between at least 2015-2020; (2) the quality control issues would require RTX to recall and reinspect many of its GTF airplanes, impacting its customers and harming its business; and (3) the Company failed to maintain internal controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

203.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

204.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

205.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, and ratification of the Company's independent auditor.

206.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

207.     Plaintiff, on behalf of RTX, has no adequate remedy at law.

## CLAIM TWO

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

208.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding RTX. Not only is RTX now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon RTX by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging RTX.

210.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

211.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about RTX not misleading.

212.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by RTX.

213.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

214.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

215.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

216.    Plaintiff on behalf of RTX has no adequate remedy at law.

## CLAIM THREE

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

217.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

218.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase RTX stock at prices artificially inflated by those materially false and misleading statements.

219.    Plaintiff, on behalf of RTX, has no adequate remedy at law.

## CLAIM FOUR

### Against the Individual Defendants for Waste of Corporate Assets

220.    Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

221.    As a direct result of their wrongdoing herein, Defendants have wasted  RTX's valuable corporate assets by, among other things, causing RTX to pay excessive and improper compensation, fees, and salaries to Defendants who breached their fiduciary duties and by causing the Company to incur millions of dollars of legal liability or legal costs to defend Defendants' unlawful actions and to lose financing from investors and business from future customers who no longer

trust RTX and its products. As a result of the waste of corporate assets as alleged herein, Defendants damaged RTX and as such are liable to RTX for corporate waste.

222.    Plaintiff, on behalf of RTX, has no adequate remedy at law.

## CLAIM FIVE

**Against Defendants Hayes, Mitchill, and O'Brien for
Contribution Under Section 21D of the Exchange Act**

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    The conduct of Defendants Hayes, Mitchill, and O'Brien as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

225.    RTX and Defendants Mitchill, Hayes, and O'Brien are named as defendants in the related Securities Class Actions that allege and assert claims arising under the federal securities laws. RTX is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

226.    If RTX is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Hayes, Mitchill, and O'Brien as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. RTX is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

227.    As officers and directors, Defendants Hayes, Mitchill, and O'Brien had the power or ability to, and did, control or influence, either directly or indirectly, RTX's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly

control or influence the specific corporate statements and conduct that violated the federal securities laws.

228.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

229.    Defendants Hayes, Mitchill, and O'Brien have damaged the Company and are liable to the Company for contribution.

230.    As such, RTX is entitled to receive all appropriate contribution or indemnification from Defendants Hayes, Mitchill, and O'Brien.

## CLAIM SIX

### Against the Individual Defendants for Unjust Enrichment

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.    Through the wrongful course of conduct and actions complained of herein, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, RTX.

233.    The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from RTX that was tied to the performance or artificially inflated valuation of RTX, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

234.    Plaintiff, as a stockholder of RTX, seeks restitution from the Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants, from their wrongful course of conduct.

235.     Plaintiff, on behalf of RTX, has no adequate remedy at law.

## CLAIM SEVEN

### Against the Individual Defendants for Gross Mismanagement

236.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

237.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of RTX in a manner consistent with the operations of a publicly held corporation.

238.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, RTX has sustained and will continue to sustain significant damages.

239.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## CLAIM EIGHT

### Against the Individual Defendants for Abuse of Control

240.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RTX, for which they are legally responsible.

242.     As a direct and proximate result of the Individual Defendants' abuse of control, RTX has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, RTX has sustained

and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

243.    Plaintiff, on behalf of RTX, has no adequate remedy at law.

## CLAIM NINE

### Against the Individual Defendants for Breach of Fiduciary Duties

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RTX's business and affairs

246.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

247.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RTX.

248.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

249.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the foregoing false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

250.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company's internal controls were not adequately maintained, or acted

with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

251.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

252.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RTX has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

253.    Plaintiff, on behalf of RTX, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all defendants as follows:

A.    Declaring that Defendants have breached their fiduciary duties to RTX and committed other violations of state and federal law, including, but not limited to, corporate waste;

B.    Declaring that Plaintiff may maintain this action on behalf of RTX and that Plaintiff is an adequate representative of the Company;

C.    Determining that this action is a proper derivative action maintainable under law;

D.    Determining and awarding to RTX the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

E.    Directing RTX to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with RTX's existing governance obligations and all

applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.     Awarding RTX damages including, without limitation, punitive damages, together with pre-and post-judgment interest to the Company;

G.     Providing extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of RTX, has an effective remedy;

H.     Awarding RTX restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

I.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.     Granting such other and further relief as this Court deems just and equitable.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 23, 2026

**DELEEUW LAW LLC**

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar # 3569)
1301 Walnut Green Road
Wilmington, Delaware 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
brad@deleeuwlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com